**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAY SHEK,**<br><br>　　　　　**Plaintiff,**<br><br>**v.**<br><br>**CUSTOMERS BANCORP, INC. and CUSTOMERS BANK,**<br><br>　　　　　**Defendants.** | **CIVIL ACTION NO. _____**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND JURY DEMAND**

Plaintiff Jay Shek, by and through his attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint"):

**PRELIMINARY STATEMENT**

1.　　　　This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Jay Shek ("Mr. Shek"), a former employee of Defendant Customers Bancorp, Inc. and Customers Bank (collectively "Defendants" or "CUBI"). Mr. Shek has been harmed by Defendants' retaliation for his reporting of, opposition to, complaints about, and refusal to participate in, conduct he reasonably believed to constitute fraud and violations of the rules and regulations of the Securities and Exchange Commission, culminating in his constructive discharge on December 21, 2024.

2.　　　　This action is filed pursuant to Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, and the common law of the Commonwealth of Pennsylvania.

## JURISDICTIONAL STATEMENT

3.      This Court has original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.      This Court has jurisdiction over Plaintiff's claim under Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(b)(1)(B), which grants the district courts of the United States original jurisdiction over an action for de novo review brought by a person alleging discrimination in violation of the statute where the Secretary of Labor has not issued a final decision within 180 days of the filing of the administrative complaint and there is no showing that such delay is due to the bad faith of the claimant. Section 1514A(b)(1)(B) provides that the district court shall have jurisdiction over such an action without regard to the amount in controversy.

5.      This Court has supplemental jurisdiction over Plaintiff's Pennsylvania state law claim pursuant to 28 U.S.C. § 1367.

6.      All conditions precedent to the institution of this suit have been fulfilled. On June 17, 2025, and within 180 days of the adverse action, Mr. Shek timely filed a complaint of retaliation under Section 806 of the Sarbanes-Oxley Act with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), which was assigned OSHA Case No. 301066914. On August 5, 2025, the Secretary of Labor, acting through OSHA, issued Findings dismissing the complaint. On September 3, 2025, Mr. Shek timely filed objections to the Secretary's Findings and requested a hearing before an Administrative Law Judge, and the matter was docketed with the United States Department of Labor Office of Administrative Law Judges as Case No. 2025-SOX-00053.

2

7.      The Secretary of Labor has not issued a final decision on Mr. Shek's complaint within 180 days of its filing, and the delay is not due to any bad faith on the part of Mr. Shek. Accordingly, Mr. Shek is entitled to bring this action for de novo review in this Court pursuant to 18 U.S.C. § 1514A(b)(1)(B).

## VENUE

8.      This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

9.      This action properly lies in the Eastern District of Pennsylvania because the claims and significant activities associated with the claims arose in this judicial district, and Plaintiff was employed by Defendants in this judicial district.

## PARTIES

10.      Plaintiff Jay Shek is an adult male individual and a citizen and resident of Reading, Pennsylvania and the United States of America.

11.      Defendant Customers Bancorp, Inc. is a publicly-traded bank holding company with its corporate headquarters and principal place of business located at 701 Reading Avenue, West Reading, Pennsylvania 19611, where Mr. Shek was employed.

12.      Defendant Customers Bank is a subsidiary of Defendant Customers Bancorp, Inc. with its corporate headquarters and principal place of business located at 701 Reading Avenue, West Reading, Pennsylvania 19611, where Mr. Shek was employed.

13.      Defendant Customers Bancorp, Inc. is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), and is therefore a company within the meaning of 18 U.S.C. § 1514A.

14. Defendant Customers Bank is a subsidiary of Defendant Customers Bancorp, Inc. whose financial information is included in the consolidated financial statements of Customers Bancorp, Inc., and is therefore a company within the meaning of 18 U.S.C. § 1514A.

15. At all relevant times, Mr. Shek was an employee of Defendants within the meaning of 18 U.S.C. § 1514A, and is accordingly entitled to the protections of said statute.

16. At all relevant times, Defendants each are and have been employers employing more than five hundred (500) employees.

17. Defendants do significant business within the Commonwealth of Pennsylvania.

18. At all relevant times, employees of Defendants acted as agents and servants for Defendants.

19. At all relevant times, employees of Defendants were acting within the scope of their authority and in the course of employment under the direct control of Defendants.

20. At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

21. This Honorable Court has jurisdiction over Defendants.

### FACTS

22. Mr. Shek, CPA, CFA, is a senior investment executive with subject matter expertise in US GAAP accounting, and bank regulatory reporting in areas of treasury, derivatives, and complex investment products.

23. Mr. Shek began his employment with CUBI as the Vice President, Treasury Accounting Manager on or about March 4, 2024, and was hired by CUBI to build out CUBI's treasury reporting and accounting function, which was managed by Bruce Reiprich, Deputy Controller, who in turn reported to Jesse Velazquez, Chief Accounting Officer.

4

24.     After his hire by CUBI, Mr. Shek similarly initially reported to Mr. Velazquez.

25.     While employed by CUBI, Mr. Shek performed his duties in an excellent, hardworking and dedicated manner.

26.     Despite his loyalty and consistent performance, Mr. Shek was retaliated against for expressing his concerns of fraudulent and/or illegal activity by CUBI and his refusal to go along with the illegal activity, culminating in his constructive discharge.

27.     Mr. Shek's repeated complaints about fraud and other practices at CUBI, which violated SEC rules and regulations, led to retaliation, Mr. Shek's demotion and the constructive termination of his employment.

28.     Mr. Shek engaged in the protected activity of reporting potential fraud and violations of Securities and Exchange Commission rules and regulations to CUBI's management and senior leadership on numerous occasions.

29.     Mr. Shek made a number of complaints regarding fraudulent financial practices at CUBI that he believed to be unethical and in violation of applicable guidelines and regulations.

30.     CUBI had a practice of, among other things, making material misstatements and misinformation in its reports to bank regulators, the SEC, and the investing public; misrepresenting internal (SOX) controls that either did not exist or were not enforced as described; and preparing, reporting, and filing financial documents – such as schedules and reconciliations – that were convoluted, incomplete, and/or fabricated.

31.     Mr. Shek investigated these fraudulent and/or unethical activities and repeatedly expressed his opposition to these practices.

32.    For example, Mr. Shek raised objections about CUBI's violations of SOX controls to CUBI's Deputy Controller and about CUBI's refusal to cooperate or release documents for review to the regulatory team to CUBI's Director of Regulatory Reporting.

33.    To rectify the situation and ensure future reporting would involve accurate information, Mr. Shek recommended that his Treasury Accounting team be responsible for generating all securities and derivatives reporting and disclosures for SEC and REG reporting.

34.    However, Mr. Shek encountered significant resistance and opposition to his counsel and advisement.

35.    As it became clear that CUBI was willfully choosing to deceive stakeholders, fabricate information, and neglect implementing best practices to ensure accurate financials, Mr. Shek filed an official complaint with Human Resources, the Chief Financial Officer, the Chief Executive Officer, and the Chief Accounting Officer

36.    From the inception of his employment, Mr. Shek faced deceptive representations regarding CUBI's compliance status and practices.

37.    Although he worked diligently to counteract and address these issues, his efforts were thwarted and met with hostility.

38.    In or about March 2024, shortly after Mr. Shek began his employment at CUBI, Mr. Shek participated in a meeting that was also attended by Mr. Velazquez; Mr. Reiprich and Phu Chao, Accountant.

39.    During the meeting, Mr. Velazquez walked the team through schedules and the accounts Mr. Shek would oversee, which included CUBI's investment portfolio accounts and derivative accounts.

40.     Given that these accounts are considered high risk from a financial statement perspective, Mr. Shek asked Mr. Velazquez if documented procedures, internal controls, and review checkpoints existed for these accounts, and if there were any exceptions identified by auditors.

41.     Mr. Velazquez assured Mr. Shek that appropriate procedures and controls were in place and there were no known issues or exceptions.

42.     However, contrary to Mr. Velazquez's claims, early on in his tenure at CUBI, Mr. Shek identified significant legacy accounting outages and gaps.

43.     Indeed, Mr. Shek observed that most of the schedules that supported the securities and derivatives monthly accounting had neither a preparer procedure nor any evidence of review.

44.     In fact, the schedules appeared to have been cobbled together from unidentified source worksheets, hard coded numbers with no basis, and notes with no indication of the author.

36.     As Mr. Shek delved deeper into the treasury accounting processes, he observed that Journal Entries for millions of dollars in transactions in Workday, CUBI's General Ledger, appeared not to have any support or review.

37.     As Workday identified Tom Burns as the preparer of these Journal Entries, Mr. Shek inquired with Mr. Burns about the Journal Entries.

38.     When questioned, Mr. Burns stated that while he was listed as the preparer or reviewer, he simply booked the submitted journals without reviewing them.

39.     This caused Mr. Shek significant alarm, as both the lack of support and the lack of review were violations of SOX controls.

40.    As such, Mr. Shek connected with Mr. Reiprich and asked to be assigned as the reviewer of all treasury journal transactions with immediate effect so as to correct these violations.

41.    However, Mr. Reiprich never responded to Mr. Shek's request.

42.    Instead, Mr. Reiprich and Mr. Burns continued to book transactions in treasury accounts that had no support and appeared to have no basis.

43.    This pointed to inappropriate accounting schemes and attempts to correct accounting errors by topside and temporary journals.

44.    As Mr. Shek assumed additional treasury tasks in his position, he noticed that both the securities and derivatives schedules had large unexplained variances between what CUBI's third party accounting provider reported (STIFLE for securities, CHATHAM for derivatives) and what CUBI reported, for both Balance Sheet and Income Statement Accounts.

45.    Accounts that had these issues included three derivatives accrued accounts, one derivatives netting account, one derivatives cash account, and five Securities AIR accounts. Additionally, multiple high-risk accounts did not exist in the schedules, specifically accounts related to derivatives interest income, including three missing accounts for hedging derivatives and one missing account for back-to-back derivatives. These material out of balances related to multiple accounts would be an immediate red flag to auditors because they invalidate multiple key audit assertions, primarily completeness; accuracy, validation, and allocation; and cutoff.

46.    These gaps and issues were significant enough to cause material misstatements and misinformation in CUBI's reports to bank regulators, the SEC, and the investing public.

47.    Additionally, accountants at CUBI willfully deceived CUBI's auditor, Deloitte, and its SOX consultant, CNM, by loading empty or incomplete reconciliations in Cadency

through referencing nonexistent or irrelevant source documents in the reconciliations, booking topside adjustments that had no basis, stripping accounts from the ESSBASE Trial Balance, and misrepresenting internal controls that either did not exist or were not enforced as described.

48.    Mr. Shek recognized these acts of omission, involving a lack of proper work to ensure accurate financials, and attempts to deceive and fabricate information, as clear violations of ethical standards prescribed by both the American Institute of Certified Public Accountants ("AICPA") and the CFA Institute.

49.    As such, Mr. Shek split the task of remedying CUBI's proven defective process by focusing on two key areas: activity and balances.

50.    Activity related to all transactions; investment returns, sales, purchases, calls, paydowns, new derivative strategies, derivative MTM, accruals and cash. Seeing the significant weaknesses in activity schedules, Mr. Shek set about redesigning these from scratch.

51.    The new schedules were subsequently launched within two months of creation.

52.    Related to balances, upon Mr. Shek's request, Mr. Reiprich and Mr. Chao spent two business days investigating the issues on the securities accounts.

53.    Mr. Reiprich and Mr. Chao eventually edited the Investment Rollforward and added notes from STIFLE for March 31, 2024.

54.    Upon a review of these notes, Mr. Shek found most were still defective.

55.    The defects included, among others, those related to AIR for CUSIPs that had been sold, incorrectly classified investment categories, and CUSIPs that did not exist.

56.    Mr. Shek discussed this schedule with Julia Hoang, CUBI's SEC Reporting Manager.

9

57.     Ms. Hoang agreed with Mr. Shek's assessment and stated that she was mystified by Mr. Reiprich and Mr. Chao's schedule, and that their numbers were off by millions of dollars in multiple sets of accounts.

58.     She furthermore stated that she was worried CUBI's SEC schedules were likely grossly misstated.

59.     In addition, Ms. Hoang said that she had limited knowledge of complex securities and derivatives and asked Mr. Shek's team to generate the SEC schedules and derivatives for these areas.

60.     Mr. Shek made a note to have a follow up conversation with Mr. Velazquez and Hiroshi Abe, Senior Vice President, Financial Reporting.

61.     At this stage, Mr. Shek had confirmation that (1) significant deficiencies existed in Mr. Reiprich's legacy securities and derivatives Rollforward schedules, and (2) Ms. Hoang did not have an ability to cure these deficiencies due to lack of authority and subject matter knowledge.

62.     As such, in a leadership team meeting attended by Mr. Velazquez and Mr. Abe, Mr. Shek advised that his Treasury Accounting team be responsible for generating all securities and derivatives reporting and disclosures for SEC and REG reporting.

63.     Mr. Velazquez voiced his approval for this proposal.

64.     With Mr. Velazquez and the leadership team in agreement that this was the correct approach, Mr. Shek subsequently scheduled a meeting with the SEC team.

65.     The meeting was attended by several individuals with accounting policy, as well as Mr. Abe and Ms. Hoang.

66.    During this meeting, Mr. Abe vehemently objected to Treasury Accounting having any control or access to investment schedules related to Derivative and Securities.

67.    Mr. Shek emphasized the need for his team to review these schedules for completeness and accuracy and to prevent misstatements.

68.    Mr. Abe refused to consent to Mr. Shek's advising and counsel, stating, "I will not agree to this - it seems like a waste of time. I don't understand why this review is needed."

69.    Mr. Abe also refused to send to the Treasury Accounting team any reconciliations or support for Q2 SEC reported lines that were misstated by millions of dollars, such as OCI ("Other Comprehensive Income"), a high-risk line item driven by derivatives.

70.    In or about June 2024, concerned by the large misstatements in CUBI's publicly reported SEC schedules for Q2 and Mr. Abe's refusal to allow the Treasury Accounting team to have access or control to the relevant investment schedules, Mr. Shek submitted an official complaint to Human Resources, Chief Financial Officer Phil Watkins, Chief Executive Officer Sam Sidhu, and Mr. Velazquez.

71.    Mr. Shek also subsequently discussed Mr. Abe's reluctance to adopt best practices with Marc Stencil, CUBI's newly hired Director of Regulatory Reporting.

72.    Mr. Stencil stated that he had previously had the same type of meeting with Mr. Abe wherein Mr. Abe similarly refused to cooperate or release documents for review to the regulatory team. Mr. Shek sent Mr. Stencil a copy of the complaint he had submitted.

73.    Mr. Stencil responded, "Jay, your concerns are on point, I could not have put this better."

74.    Shortly after his complaint of CUBI's wrongdoing and fraudulent and unethical activity, Mr. Shek was retaliated against when his position was restructured such that he was no

11

longer to report directly to Mr. Velazquez, but rather to Sandra Pintor, the recently hired Assistant Controller.

75. This was effectively a demotion, as Ms. Pintor in turn reports to Mr. Velazquez and admitted to Mr. Shek that she had general treasury experience but no real exposure to derivative or complex products.

76. Additionally, Mr. Shek faced retaliation as he began to be excluded from leadership team meetings that he previously attended.

77. During this time, Albert Merkin, CUBI's Vice President of Reconciliations, reached out to Mr. Shek with complaints on the legacy Securities and Derivatives reconciliations.

78. These were the legacy reconciliations that Mr. Chao had prepared and Mr. Reiprich had reviewed.

79. Mr. Merkin stated, "Jay, these reconciliations are so convoluted and full of so many odd adjustments and circular references. I feel like there's a deliberate attempt to hide stuff."

80. Mr. Shek agreed.

81. When Mr. Shek launched the new format reconciliations, Mr. Merkin commented that they were "phenomenal" and "super easy to understand."

82. Mr. Merkin further stated that the numbers were now so well laid out, he did not even need an orientation as he could understand Mr. Shek's identified differences and track them easily.

83. Mr. Shek responded that these were high value and high-risk accounts, and thus this updated clear format was best practice.

84.    Mr. Shek still emphasized, however, that he needed to discuss the legacy outages with Mr. Reiprich, as they were quite large.

85.    Mr. Merkin agreed that this was essential.

86.    Mr. Merkin also described an Essbase TB that did not foot (i.e. balance), which was a clear indicator of misstated financials.

87.    Mr. Merkin, who had been with CUBI for two to three years at that point, stated that he had seen this early in his tenure but that he had not received a remedy or response that had satisfied him.

88.    In or about August 2024, CUBI received a comment from Deloitte's tax team regarding the inadequacy of CUBI's 2023 derivative reconciliations.

89.    Deloitte's tax team (a separate entity and not directly connected with the Audit team) commented on the poor quality and lack of transparency in CUBI's December 2023 reconciliations and raised many of the issues Mr. Shek has identified herein: the lack of support and the fact that key accounts were missing.

90.    Deloitte requested that CUBI remedy this for 2024.

91.    Since Mr. Shek had introduced new schedules, he was confident that CUBI would be able to remedy this issue save for the legacy out of balances that he had inherited.

92.    As a control measure, Mr. Merkin and Mr. Shek decided to manually extract and test 2024's Q1 derivative reconciliations from Cadency.

93.    They discovered that empty files had been loaded into Cadency for January, February, and March 2024, ostensibly to flag these reconciliations as complete to senior management and Deloitte.

94.    December 2023 had an incomplete reconciliation, as did April 2024.

95.     However, it appeared that the empty January, February and March files were simply uploaded to deceive the system.

96.     The same accountant had been responsible for these reconciliations during this period, a staff accountant, who reported to Mr. Reiprich.

97.     Mr. Shek's launch of the new derivative and securities schedules remedied CUBI's process moving forward.

98.     However, the legacy outages were still unresolved, and they remained material and significant.

99.     They also pointed to a poor internal control and demonstrably misstated public reports and disclosures by CUBI.

100.    Mr. Shek requested that Mr. Reiprich and Mr. Chao work together to identify and remedy these legacy outages.

101.    In August 2024, Mr. Chao resigned his position.

102.    In a call with Mr. Shek, Mr. Chao stated that he had limited understanding of the subject matter and had no supervision from Mr. Reiprich.

103.    Mr. Chao said that Mr. Reiprich often sent him topside journal entries to allegedly correct items, but he had no understanding of the correction or its intent.

104.    Mr. Chao told Mr. Shek, "I always suspected something odd was going on with these adjustments. Now that I've been trying to cure these legacy out of balances, I realize that we were just putting in short term fixes to satisfy Deloitte."

105.    Throughout August and October 2024, Mr. Shek followed up with Mr. Reiprich on the material legacy outages that would soon be part of CUBI's year-end financials.

14

106. Mr. Shek urged Mr. Reiprich to prioritize the resolution of these items that Mr. Shek had inherited.

107. However, Mr. Shek observed that Mr. Reiprich's solutions were often to clear outages by booking topside entries to accounts that were not on the Auditor's risk management's radar.

108. The topside entries cleared the issue by shifting it to another section of the financials, which in turn was not released to the auditors.

109. This was not a true remedy, but rather an attempt to mislead and obfuscate the issue.

110. By way of example, Mr. Reiprich booked a large adjustment entry to AFS Derivatives OCI that had no basis in fact.

111. He booked many such entries, including ones to clear derivative collateral and cash accounts.

112. In or about September 2024, CUBI responded to FDIC complaints by hiring PWC for a comprehensive assessment for all Call and FRY-9C reports, which are reports submitted by banks to the government.

113. PWC responded by flagging a majority of CUBI's reports as erroneous in procedural process and control checks.

114. To help CUBI's regulatory reporting team address these issues, Mr. Shek rewrote the procedures for the RC-B, the RC-D and the HC-B.

115. In these reports, Mr. Shek found that CUBI had misinterpreted the federal directives and had not reported trading assets.

116. Trading assets are marked to market and create the greatest degree of income statement volatility.

117. Upon review, Mr. Shek found that CUBI did own trading assets and had deliberately and deceptively chosen not to report these on the RC-D.

118. CUBI had loans categorized as "Held for Sale" that were deliberately excluded from the RC-D.

119. Mr. Reiprich's reasoning as to why the trading assets were not reported was that "we get rid of these quickly."

120. This argument did not hold water, as similar errors, misstatements, and obfuscations existed in the RC-R and multiple other regulatory schedules.

121. As Mr. Shek persisted in his attempts to raise his concerns regarding CUBI's misstatements and refused to go along with these misstatements, he continued to face retaliation.

122. On or about December 20, 2024, Mr. Shek's position was restructured for a second time.

123. This time, Mr. Shek was reassigned such that he no longer reported to Ms. Pintor but instead reported to Mr. Reiprich, the instigator of many of CUBI's fraudulent and unethical activity.

124. Over the course of his nine months of employment as Treasury VP, Mr. Shek served as the liaison between CUBI's front office treasury team and the back-office accounting team.

125. While senior leaders within the treasury front office, such as William Prangley, SVP; Richard Alban, SVP; and Dan Park, Treasurer, commended Mr. Shek on his expertise and

16

contributions, the senior leaders on the accounting and back office side opposed Mr. Shek's proposals and best practices.

126. In Q4, Mr. Shek was actively and repeatedly prevented by Mr. Abe from reviewing investment and securities workpapers.

127. Mr. Shek's attempts to assess and correct out of balance derivatives Cash, OCI, and Derivative Income (high risk accounts) were similarly rebuffed, and he was admonished in a team meeting by Mr. Abe for his efforts to make these necessary corrections and for his refusal to go along with the illegal activity.

128. Mr. Shek made multiple attempts to cure CUBI's financials of misstatements but continually faced pushback, retaliation, and attempts by CUBI to inappropriately conceal its misstatements and misrepresentations.

129. In August 2024, the Federal Reserve initiated enforcement action against CUBI for "significant deficiencies" in its risk management practices.

130. In addition, an external auditor (PWC) identified multiple errors in CUBI's FDIC call reports.

131. The root cause of these issues can be tracked to the accounting group led by Mr. Velazquez.

132. While Mr. Shek identified specific instances of unethical actions, and deceptive practices that he personally encountered, these practices are likely widespread and endemic throughout CUBI's accounting and reporting group.

133. In conversations that Mr. Shek had with Mr. Burns, Ms. Hoang, and Mr. Merkin, all three expressed concerns regarding unexplained errors and omissions they had witnessed during their much longer tenures at CUBI.

17

134.    As Mr. Shek digested this information, he grew increasingly concerned that CUBI's assertions to the public on its financials had no basis in fact.

135.    On December 21, 2024, Mr. Shek was forced to leave his position at CUBI, as a result of the campaign of retaliation CUBI initiated against him for his reports and complaints of fraudulent and unethical activity, as well as his refusal to engage in CUBI's wrongdoing.

136.    Mr. Shek was constructively discharged from his position, as he was unwilling to participate in CUBI's wrongful practices and his extensive efforts to bring CUBI into compliance were repeatedly rejected and he was met with retaliation for his efforts and refusal to engage in what he reasonably believed to be illegal activity.

137.    That same day, Mr. Shek emailed Mr. Sidhu and Mr. Watkins to detail the reasons for his resignation, including his opposition to CUBI's fraudulent and unethical and/or illegal activity and CUBI's abject failure to properly address Mr. Shek's legitimate concerns.

138.    Based on the foregoing, given his treatment during his employment with CUBI, Mr. Shek maintains that CUBI retaliated against him for reporting, opposing, complaining about, and refusing to engage in conduct he reasonably believed to be illegal and unethical, including conduct he reasonably believed constituted mail fraud, wire fraud, bank fraud, or securities fraud, a violation of the rules and regulations of the Securities and Exchange Commission, or fraud against shareholders.

139.    Mr. Shek has suffered significant financial losses, including lost wages and other benefits of employment, as a direct and proximate result of the actions and inactions of the Defendants.

140.    Mr. Shek has suffered harm to his reputation in the community and other harm and damages as a direct and proximate result of the actions and inactions of the Defendants.

141.    As a result of Defendants' conduct described herein, Mr. Shek has suffered and continues to suffer significant emotional distress and hardship.

142.    Mr. Shek has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and/or inactions of Defendants.

143.    Defendants and their agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Mr. Shek to suffer emotional distress.

144.    As a result of the Defendants' conduct described herein, Mr. Shek has incurred a significant obligation for attorneys' fees and costs of bringing this action.

## COUNT I
### Retaliation in Violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A

145.    Plaintiff Jay Shek repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

146.    Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, prohibits a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, and any officer, employee, contractor, subcontractor, or agent of such company, from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information regarding, or to otherwise assist in an investigation regarding, any conduct which the employee reasonably believes constitutes a violation of 18 U.S.C. §§ 1341, 1343, 1344, or 1348, any rule or regulation

19

of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

147.    Defendants are covered employers within the meaning of 18 U.S.C. § 1514A, and Mr. Shek was a covered employee within the meaning of 18 U.S.C. § 1514A.

148.    Mr. Shek engaged in protected activity under 18 U.S.C. § 1514A when he reported to and complained to CUBI's management and senior leadership, including Human Resources, the Chief Financial Officer, the Chief Executive Officer, and the Chief Accounting Officer, regarding conduct he reasonably believed constituted mail fraud, wire fraud, bank fraud, or securities fraud, violations of the rules and regulations of the Securities and Exchange Commission, and fraud against shareholders, as set forth herein.

149.    Mr. Shek also engaged in protected activity under 18 U.S.C. § 1514A when he objected to, opposed, and refused to participate in CUBI's fraudulent and unethical financial reporting practices, as set forth herein.

150.    Defendants had knowledge of Mr. Shek's protected activity.

151.    Following and because of his protected activity, Mr. Shek suffered adverse employment actions, including being excluded from leadership team meetings that he had previously attended, being admonished for his efforts to cure CUBI's financials of misstatements, having his position restructured twice resulting in two effective demotions, and being constructively discharged on December 21, 2024.

152.    Mr. Shek's protected activity was a contributing factor in the adverse employment actions taken against him by Defendants.

153.    Defendants would not have taken the same adverse employment actions against Mr. Shek in the absence of his protected activity.

20

154.     As a direct and proximate result of Defendants' violations of the Sarbanes-Oxley Act, Mr. Shek has sustained a loss of earnings and earning potential, back pay with interest, front pay, severe emotional and psychological distress, personal embarrassment, loss of self-esteem, harm to his reputation, and other special damages, and has incurred litigation costs, expert witness fees, and reasonable attorneys' fees.

155.     Pursuant to 18 U.S.C. § 1514A(c), Mr. Shek is entitled to all relief necessary to make him whole, including reinstatement with the same seniority status that he would have had but for the discrimination, back pay with interest, and compensation for all special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorneys' fees.

## COUNT II
### Wrongful Termination in Violation of Pennsylvania Public Policy

156.     Plaintiff Jay Shek repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

157.     Mr. Shek opposed, complained about, and refused to participate in unethical, fraudulent and illegal activity engaged in by Defendants, as alleged herein.

158.     Among other things, Mr. Shek objected to and refused to participate in Defendants' conduct, which he reasonably believed was in violation of, among other statutes, 18 Pa.C.S. § 4104 (relating to tampering with records or identification), 18 Pa.C.S. § 4107 (relating to deceptive or fraudulent business practices), 18 Pa.C.S. § 4903 (relating to false swearing), and 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

159.     Mr. Shek was retaliated against and constructively discharged for his opposition to, and refusal to engage in, unethical, fraudulent and illegal activity in violation of Pennsylvania public policy.

21

160. The above-described conduct of Defendants, in retaliating against Mr. Shek resulting in his constructive discharge, represents wrongful termination pursuant to the common law of the Commonwealth of Pennsylvania.

161. Said violations warrant the imposition of punitive damages.

162. As the direct and proximate result of Defendants' violations of Pennsylvania public policy, Plaintiff Jay Shek has sustained a loss of earnings, severe emotional and psychological distress, personal embarrassment, loss of self-esteem, loss of earning power, as well as back pay, front pay, interest due thereon, and has incurred attorneys' fees and costs.

**PRAYER FOR RELIEF**

163. Plaintiff Jay Shek repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Jay Shek respectfully requests that this Court enter judgment in his favor and against Defendants Customers Bancorp, Inc. and Customers Bank and Order:

a. Appropriate equitable relief, including reinstatement with the same seniority status that Plaintiff would have had but for the discrimination;

b. Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful retaliation;

c. Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of their unlawful conduct, including back pay with interest and front pay;

d. Defendants to pay Plaintiff compensation for all special damages sustained as a result of the discrimination;

e.  Defendants to pay Plaintiff punitive damages;

f.  Defendants to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g.  Defendants to pay Plaintiff's costs of bringing this action, including litigation costs, expert witness fees, and reasonable attorneys' fees;

h.  Plaintiff be granted any and all other remedies available pursuant to the Sarbanes-Oxley Act and Pennsylvania common law; and

i.  Such other and further relief as is deemed just and proper.

## **JURY DEMAND**

Plaintiff Jay Shek hereby demands trial by jury as to all issues so triable.

By: */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Boulevard
Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Jay Shek*

Dated:  August 4, 2026